J-S85044-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| IN RE: A.A.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: P.A.F., NATURAL FATHER | |
| Appellant | No. 1482 WDA 2017 |

Appeal from the Decree entered September 1, 2017
In the Court of Common Pleas of Blair County
Orphans' Court at No: 2017 AD 5

BEFORE:  BOWES, PANELLA, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    FILED MARCH 12, 2018

P.A.F. (Father) appeals from the amended decree entered September 1, 2017, which involuntarily terminated his parental rights to his minor son, A.A.F. (Child), born in January 2016.[1]  After careful review, we affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> . . . [Blair County Chlidren, Youth and Families (BCCYF)] was granted verbal emergency protective custody of the subject child by the undersigned on May 4, 2016.  [BCCYF] filed an Application for Emergency Protective Custody and a Shelter Care Application. In the Order for Emergency Protective Custody entered May 5, 2016, BCCYF was granted custody, including right of placement. BCCYF filed both applications based upon reports that the Mother had not been bonding with the child since birth; that the child had

_____

[1] The decree also terminated the parental rights of Child's mother, B.M.B. (Mother).  Mother filed an appeal at Superior Court Docket No. 1421 WDA 2017, which we address in a separate memorandum.

developmental delays; that the Mother was not following through with recommendations of in-home service providers regarding the child not meeting developmental milestones; that the Mother had intellectual limitations and mental health concerns but was not taking her prescribed medication; and that the parents would not allow the child to be assessed for Early Intervention despite a referral by the service provider. On May 4, 2016, the date the emergency verbal order was given, BCCYF caseworkers went to the family residence and observed the Mother holding the young child inappropriately; that the child's head was significantly flat; that the child was not responding when they tried to interact with him; and the Mother was unable to identify the child's primary care physician. Furthermore, they observed that the downstairs of the residence was cluttered with construction tools and that the Mother's bedroom was cluttered with pill bottles and an old bottle of baby formula on the floor. There was also an individual residing in the home with an active arrest warrant.

After the Shelter Care hearing held May 6, 2016 before Hearing Officer James V. McGough, Esquire, a Shelter Care Order was entered on May 10, 2016 returning legal and physical custody of the child to the Father and directing BCCYF to provide general protective services. [BCCYF] was to make an immediate referral for family preservation services; and the parents were directed to cooperate with services through Home Nursing Agency Nurse Family Partnership, the WIC Program and any recommendations made by the pediatrician. Further, both parents were directed to cooperate with an Early Intervention Assessment for the child and cooperate with any recommended services.

Upon request of [BCCYF], a Shelter Care Rehearing was held on May 11, 2016 before the undersigned, at which time the record from the original shelter care hearing held May 6, 2016 was incorporated. Legal and physical custody was vested in both parents with the child to remain under the protective supervision of [BCCYF]. Both parents were again directed to cooperate with all recommended services, and the Mother was specifically directed to engage in mental health counseling and follow all treatment recommendations, including taking her medication as prescribed.

On May 6, 2016, BCCYF filed a Dependency Petition and a Motion for Finding of Aggravated Circumstances alleged as to the Father, based upon the fact that his parental rights had previously been involuntarily terminated relative to another child. After hearings

held May 11, July 26 and August 11, 2016, we entered an Order of Adjudication and Disposition on August 18, 2016 finding the subject child to be dependent. The record from these three proceedings was quite extensive. To summarize the several bases for a finding of dependency, such would include the Mother's significant mental issues which affected her bonding and attachment with the child; the developmental delays for the child which were discussed with the parents; the parents consistently placing a blanket or other items in the baby's crib which created safety concerns; the parents['] refusal to follow through with recommended services for Early Intervention and the Parents as Teachers Program; unknown people coming in and out of the home while service providers were present; inappropriate behavior by D.F., the paternal grandfather, who has his own mental health issues; the parents' difficulty in establishing a daily schedule and routine for their child; resistance; anger and hostility by the Father toward service providers; the Father's refusal to undergo a mental health evaluation even though he had been previously diagnosed with a bipolar condition; the conflict between the parents, including yelling and screaming in the presence of child; the parents' inability to attend to the basic necessities for the child; the lack of cooperation and progress with service providers; and each service provider testifying that they could not ensure the safety of the child within the parents' home. Based upon the evidence adduced during these hearings, we granted BCCYF legal and physical custody of the child and placed the child in a foster home. We also granted [BCCYF's] Motion for Aggravated Circumstances against the Father due to an involuntary termination of his parental rights relative to another child . . . .

Trial Court Opinion, 10/12/17, at 5-8 (emphasis omitted).

On January 18, 2017, the trial court entered a permanency review order changing Child's permanent placement goal from return to parent or guardian to adoption, and relieving BCCYF of its obligation to provide reunification efforts. Mother appealed, but Father did not. A prior panel of this Court affirmed on July 19, 2017. In the Interest of A.F., 2017 WL 3050322 (Pa. Super. filed July 19, 2017) (unpublished memorandum).

On February 16, 2017, BCCYF filed a petition to involuntarily terminate Father's parental rights to Child. The trial court conducted a termination hearing on August 29, 2017. Following the hearing, on August 31, 2017, the court entered a decree terminating Father's parental rights. The court entered an amended decree on September 1, 2017.[2] Father timely filed a notice of appeal on September 29, 2017, along with a concise statement of errors complained of on appeal.

Father now raises the following issues for our review:

> A. Whether the trial court erred in terminating Father's parental rights to his child under 23 Pa. C.S.A. [§] 2511 (a)(2), (a)(5), and (a)(8)?
>
> B. Whether the trial court erred in terminating Father's parental rights under subsection (b)?

Father's Brief at 6 (unnecessary capitalization and suggested answers omitted).

We review Father's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

_____

[2] The original decree included two grounds for terminating Father's parental rights, with the trial court adding a third ground in pen. The amended decree included all three grounds.

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), appeal denied, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows.

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot

be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." In re A.L.D., 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the trial court found that Father is incapable of parenting Child, and that he cannot, or will not, remedy his parental incapacity. Trial Court Opinion, 10/12/17, at 19. The court reasoned that Father has never maintained employment, and that he refused to engage in counseling. Id. The court further reasoned that Father's visits with Child remain supervised, due to persistent safety concerns. Id. The court expressed concern that Father continues to reside with Child's paternal grandfather, who suffers from his own mental health issues. Id.

Father argues that he has the ability to care for Child and to meet his basic needs. Father's Brief at 9, 18. Father contends that he has housing, as well as access to food and formula, and that he would be available to care for Child "24/7." Id. at 18. Father contends that Child was doing well before the trial court placed him in foster care, emphasizing that Child was developmentally on target, gained weight, and had no illnesses or injuries. Id.

Our review of the record supports the trial court's decision. During the termination hearing, the court incorporated by reference Child's prior dependency proceedings, including a report prepared by psychologist, Terry O'Hara, Ph.D., in October 2016. See Petitioner's Exhibit 1 (Psychological

Evaluation Report). In his report, Dr. O'Hara explained that he conducted a global assessment of Father, which revealed a variety of significant parenting concerns. Id. at 21-25. Dr. O'Hara concluded that Child would be at risk for "neglect, abuse, exposure to domestic violence and psychological instability, depression, anxiety, truncation of appropriate development, and reactive attachment disorder" if he were returned to Father's home. Id. at 24-25.

In reaching this conclusion, Dr. O'Hara placed particular emphasis on Father's longstanding history of mental health issues. Father reported to Dr. O'Hara that he overdosed on prescription medication twice in 2010. Id. at 17-18. Father characterized one of these overdoses as a "serious suicide attempt," which occurred after he broke up with a previous girlfriend. Id. at 17. Father reported that he stopped taking his medication in 2011, and that he has "been better since." Id. at 18.

Dr. O'Hara also emphasized Father's history of engaging in aggressive behaviors. Father informed Dr. O'Hara that he had a juvenile criminal record, which stemmed from an incident during which he attacked a teacher. Id. Father claimed that the teacher "was beating on the students and he came at me and I stuck a pencil right across his hand." Id. As an adult, Father pled guilty to simple assault and disorderly conduct in 2008. Id. at 18-19. Father explained that these charges resulted from an incident during which he became intoxicated and "fought some friends . . . I pulled a sword, just to say [b]ack off." Id. at 19. Father admitted that his previous girlfriend obtained two Protection from Abuse orders against him in 2009 and 2010, although he

insisted that the orders were entered "for some unknown reason" and that his girlfriend was "very manipulative." Id. at 18. Finally, Father admitted to being argumentative with service providers during Child's dependency, although he insisted that his behavior was justified because the service providers themselves were argumentative. Id. at 16.

The testimony presented during the termination hearing reveals that Father's mental health issues and aggressive behaviors remain an ongoing concern. Child's visitation supervisor, Alexis Richards, testified that Father was verbally abusive toward Mother during a visit on May 25, 2017. N.T., 8/29/17, at 12-13. She explained, "[H]e swore at her because she wasn't correctly doing a diaper change. He was a little bit more demanding about it, like how she is supposed to be doing it. . . . [H]owever, I believe that she was doing it correctly." Id. at 13. BCCYF caseworker, Ronna Holliday, testified that Father gets angry with service providers and yells at them. Id. at 48. On one occasion, Father grabbed a service provider's arm during a doctor's appointment. Id. BCCYF recommended that Father seek counseling for anger issues, alcohol use, and intermittent explosive disorder. Id. However, Father has never engaged in any sort of counseling. Id. at 53.

Notably, Father himself testified that he is in need of counseling, and will not be able to care for Child otherwise.

> Q. And you would agree with me that it's your belief you've done everything that [BCCYF] has asked from you for purposes of effectuating reunification?
>
> A. No.

- 9 -

Q. You haven't?

A. No.

Q. What would you need to do still to effectuate reunification?

A. I would have to go through counseling now because of all of this.

Q. So is it your testimony today you presently would not be able to reunify with your son as a result of your mental health state?

A. From everything that I've been going through, no. I'd have to go through some counseling first.

Id. at 81-82.

In addition to Father's other issues, the record reveals that he continues to live with Mother, with whom he has a tumultuous, and even violent, relationship. Ms. Holliday testified that Father contacted BCCYF prior to Child's adjudication of dependency, and informed them that he had broken up with Mother and that she had moved out of the house. Id. at 64. Mother later alleged that Father and his cousin had been physically and emotionally abusive to her.[3] Id. More recently, in July 2017, Father called BCCYF stating that he and Mother had been in an argument and that he "had to go to the hospital" because Mother "may have broken his toe." Id. at 61.

Father also continues to reside with Child's paternal grandfather, D.F. Id. at 39. The record reveals that D.F. suffers from his own significant mental

_____

[3] Mother recanted these allegations. Petitioner's Exhibit 1 at 5; N.T., 8/29/17, at 104.

health issues. Id. at 40. Ms. Holliday explained, "I've tried to have conversations with him. He talks about the war. He talks about the military and we were informed by [Father] that he was never enrolled in the military." Id. Mother testified that she and Father "tried to like get a court order for [D.F.] to get back on his medication," but that D.F. is not dangerous and "just has fantasy details in his mind and, you know, [] everyone goes through that." Id. at 88, 100.

Thus, the record supports the trial court's conclusion that Father is incapable of parenting Child, and that he cannot, or will not, remedy his parental incapacity. Father suffers from significant mental health issues and displays aggressive behaviors. Father himself admits that he is in need of counseling, but failed to obtain counseling throughout Child's dependency. Moreover, Father continues to reside with Mother and D.F., despite his tumultuous relationship with Mother and D.F.'s obvious mental instability. When considered together, these issues confirm that Father cannot provide the safe, stable, and nurturing environment that Child needs.[4]

_____

[4] The record does not support the trial court's finding that Father's visits remain supervised due to persistent safety concerns. Ms. Richards testified that she observed no "endangered concerns" during Child's visits with Father, but recommended that visits remain supervised because Child likes to have two people in the room with him at the same time. N.T., 8/29/17, at 15, 18. She explained, "I feel like if the visits were unsupervised it would not go very well for [Child]. I think he would get upset very easily and feel basically left out, I guess would be the way to say it." Id. at 15. Nonetheless, we conclude that the court's remaining findings are supported by the record, and are more than sufficient to affirm the court's decision..

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)).

In its opinion, the trial court summarized the testimony presented by BCCYF, including testimony that Child is not interested in interacting with Father during visits, and that Child has a strong bond with his foster mother. Trial Court Opinion, 10/12/17, at 15-16. Based on this evidence, the court concluded that terminating Father's parental rights would best serve Child's needs and welfare. Id. at 19.

In response, Father argues that he and Child share a bond. Father's Brief at 21. Father directs our attention to his testimony describing the bond during the termination hearing. Id. at 21-22 (quoting N.T., 8/29/17, at 74-75).

Our review of the record again supports the trial court's decision. Ms. Richards testified that Father had the opportunity to attend sixteen visits with Child between January 2017 and August 2017.[5] N.T., 8/29/17, at 9. However, Father attended only eight of those visits. Id. During the visits that Father did attend, Child did not display an attachment to him. Id. at 12. Ms. Richards explained, "[Child] was not really interested in interacting with [Father] during the visits. I know there was a couple times where [Father] did pick up [Child] and [Child] started to cry because he wanted either [Mother] or I." Id.

In contrast, Ms. Richards testified that Child has a "very good bond" with his foster mother. Id. at 14. When Ms. Richards picks up Child for visits, he is often "very upset" to leave his foster mother. Id. at 14. When Ms. Richards returns Child to his foster mother after visits, his arms "reach out to her immediately." Id.

Similarly, Ms. Holliday testified that Child appears bonded with his foster parents and their biological children, and is comfortable in the foster home.

> [Child] looks to the children, the biological children in this family
> for his needs and wants. They enjoy -- he enjoys playing with

_____

[5] In its opinion, the trial court states that there were seventeen visits scheduled. Trial Court Opinion, 10/12/17, at 15. However, one of those visits was cancelled due to Child being sick. N.T., 8/29/17, at 9.

them. They enjoy playing with each other. They have a family dog that is -- he is very close with. He really enjoys being with the dog. Even with the adoptive resource father, he came in from work one day and [Child] got very excited. He was dancing. When he sat down [Child] sat with him and he stayed at his side for several minutes and then played right in front of him for the rest of the visit. The adoptive resource family has integrated him into their daily life. He's happy to see them. When I'm there he looks to them for security. Eventually he has warmed up to me and come to me but he knows that -- he seems to have -- there is a safety protectiveness [sic] with the adoptive resource family I should say. He is very comfortable in the home.

Id. at 50-51.

Thus, it is clear that terminating Father's parental rights would best serve Child's needs and welfare. Father failed to attend half of his recent visits with Child. During the visits that Father did attend, Child did not appear bonded to him. Child displays a strong bond with his foster parents, and they have integrated him fully into their family. Moreover, Father remains unable to care for Child, and preserving his parental rights would serve only to deny Child the benefits of a permanent, safe, and stable home.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to Child. Therefore, we affirm the court's September 1, 2017 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   3/12/2018